# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

Wahab B. A.,                                         Case No. 23-CV-0816 (JFD)

               Plaintiff,

v.                                                   **ORDER**

Martin J. O'Malley, Commissioner of
the Social Security Administration,

               Defendant.

---

Pursuant to 42 U.S.C. § 405(g), Plaintiff Wahab B. A. seeks judicial review of a final decision by the Commissioner of the Social Security Administration, which denied the Plaintiff's applications for disability insurance benefits ("DIB") and supplemental security income ("SSI"). In Plaintiff's Motion for Summary Judgment (Dkt. No. 9), Plaintiff argues that the administrative law judge ("ALJ") who authored the written decision erred in evaluating the severity of Plaintiff's mental health impairments and in assessing Plaintiff's residual functional capacity ("RFC"). In Defendant's responsive Brief (Dkt. No. 17), Defendant asserts that the ALJ did not err in either respect and asks the Court to affirm the final decision. As set forth below, the Court agrees with Defendant and concludes that the ALJ did not err. The Court therefore denies Plaintiff's Motion for Summary Judgment and grants the relief requested in Defendant's Brief. The Commissioner's final decision is affirmed.

1

## I.      Background

Plaintiff was 32 years old on the date of the Commissioner's final decision. (*See* R. 35, 36.)[1] He has an 11th grade education and past relevant work as a housekeeper, laborer, packager, painter, and translator. (R. 538–39.) Plaintiff contends he has been disabled since March 30, 2017, due to a somatization disorder, depression, back pain, and shoulder pain. (R. 537, 588.)

### A.      Relevant Evidence

To be entitled to DIB, Plaintiff must show he was disabled before his insured status expired on June 30, 2020. (R. 15); *Moore v. Astrue*, 572 F.3d 520, 522 (8th Cir. 2009). The relevant period for DIB purposes is from January 1, 2017, the alleged onset-of-disability date, through June 30, 2020, the date Plaintiff was last insured. *See Moore*, 572 F.3d at 522. To be entitled to SSI, Plaintiff must show he was disabled between the date he filed his application, *see Cruse v. Bowen*, 867 F.2d 1183, 1185 (8th Cir. 1989) and the date of the ALJ's decision, *see Myers v. Colvin*, 721 F.3d 521, 526 (8th Cir. 2013) (using the date of the ALJ's decision on the SSI claim to mark the end of the relevant time period). Thus, the relevant period for SSI benefits is September 30, 2019, the date Plaintiff filed his SSI application (R. 115), through March 31, 2022, the date of the ALJ's decision (R. 36). The Court limits its summation of evidence to the evidence relevant to these time periods and to the issues presented for judicial review.

---

[1] The administrative record is filed at Dkt. No. 7. The record is consecutively paginated, and the Court cites to that pagination rather than ECF number and page.

Plaintiff attended an appointment with Dr. Esayas Okubamichael on September 28, 2017, for treatment of shoulder and back pain, loss of interest, and fatigue. (R. 787.) The doctor described Plaintiff's psychiatric symptoms as "chronic fatigue and loss of interest. Feels depressed." (R. 788.) Plaintiff's PHQ-9 score was 20.[2] (R. 789.) Dr. Okubamichael's objective psychiatric findings were "[w]ell-oriented, normal speech, normal cognition and insight, slightly depressed mood." (R. 788.) Dr. Okubamichael referred Plaintiff for behavioral health treatment. (R. 789.)

On October 31, 2017, Plaintiff consulted with Dr. Ryan Engdahl about his pain and depression. Dr. Engdahl recorded a PHQ-9 score of 20. (R. 657.) The mental status examination was unremarkable. (R. 658.) In particular, Plaintiff was not anxious but was alert and oriented, and he had a full range of affect, a euthymic mood, logical thought processes and content, good insight and judgment, appropriate tolerance to frustration, and a good memory. (R. 658–59.) Dr. Engdahl recommended that Plaintiff follow up with his prescribing doctor to identify the most effective medications, attend physical therapy for his physical issues, and meet again with Dr. Engdahl to address his mood and stress management. (R. 657.)

Plaintiff returned to Dr. Engdahl on January 2, 2018. Plaintiff denied having mental health issues but said his back pain was stressful. (R. 660.) Dr. Engdahl reported findings similar to the mental status examination in October 2017. (R. 661.) Plaintiff's PHQ score

---

[2] "PHQ" is an acronym for Patient Health Questionnaire. PHQ-9 questionnaires are completed independently by a patient and are intended to reflect subjective, self-reported symptoms. *See Amy R. v. Saul*, No. 19-CV-1508 (KMM), 2020 WL 3077502, at *1 (D. Minn. June 10, 2020).

was 13, indicating moderate depression. (R. 25, 663.) In March 2018, Plaintiff told Dr. Engdahl that back pain was his main stressor and described his current pain as a "1.5." (R. 662.) He told Dr. Engdahl he was not interested in pursuing physical therapy. His PHQ score was 6, indicating mild depression. (R. 25, 663.)

Plaintiff attended an appointment with Dr. Adei Shaqra on June 7, 2019. He said his pain was "half a percent" and that one Tylenol taken in the morning lasted all day. (R. 723.) The physical examination was unremarkable, although Dr. Shaqra noted that Plaintiff's affect was flat and the doctor was not sure how much Plaintiff understood him. (R. 724.) Dr. Shaqra thought Plaintiff "may benefit from a functional capacity assessment" and would "certainly need a neuropsych evaluation" for cognitive functioning. (R. 725.)

In 2020, four state agency psychological consultants (Drs. Bonnie Katz, Rohini Mendonca, Jeffrey Boyd, and Gregory H. Salmi) each reviewed the Plaintiff's medical records and other relevant evidence. They each opined that Plaintiff was moderately limited in each of the four broad areas of mental functioning: (1) understanding, remembering, and applying information; (2) concentrating, persisting, and maintaining pace; (3) interacting socially; and (4) adapting or managing himself. (R. 121, 136, 156, 171.)

An unsigned "Behavioral Health Psychological Assessment" reflecting assessments in February and April 2021 is part of the record. (R. 1025–33.) The assessor's mental status examination findings included good cooperation, normal speech, good mood, a restricted and flat affect, logical thoughts, no anxious disturbances, good alertness and orientation, difficulties with short-term and long-term memory, and average judgment and insight. (R. 1029.) The examiner diagnosed Plaintiff, in relevant part, with a mild cognitive

4

impairment, a major depressive disorder that was recurrent but in partial remission, and an unspecified anxiety disorder. (R. 1032.) The examiner also administered several tests, on which Plaintiff performed within the less-than-one-percentile group across all cognitive domains. (R. 1031.)

In March 2021, the ALJ asked the Cooperative Disability Investigations Unit ("CDIU") of the Social Security Administration's Office of the Inspector General to investigate whether Plaintiff was malingering. (R. 618.) While conducting surveillance, an investigator observed Plaintiff and another person walk more than 1.5 miles in 90-degree heat to a residence, then back to Plaintiff's residence, stopping along the way at a gas station and liquor store. (R. 624.) At that time, Plaintiff was living in a residential boarding facility for individuals who needed psychiatric care, were chemically dependent, or needed transitional housing. (R. 625.) The resident nurse told the investigator that Plaintiff did not fit any of those criteria. The nurse also said that Plaintiff "required minimal care and was very independent and capable of performing all of his daily needs." (R. 626.)

### B.    Procedural History

Plaintiff's DIB and SSI applications were denied at both the initial review and reconsideration stages. He requested an administrative hearing before an ALJ, and that hearing took place on November 12, 2020. (*See* R. 12.) The hearing was continued to retain a medical expert and to allow Plaintiff to undergo a neuropsychological evaluation. (*See* R. 12.) A supplemental hearing occurred on May 26, 2021. (*See* R. 12.) An impartial medical expert, Dr. Michael Carney, appeared and testified, but that hearing was continued so that Dr. Carney could review newly submitted evidence. (*See* R. 12.) Dr. Carney is a

licensed clinical psychologist. (R. 68.) A third hearing was convened on November 2,
2021. (*See* R. 12.) Dr. Carney again appeared and testified, as did Sheila Capizzi, a
vocational expert. (*See* R. 12–13.) The ALJ held the hearing open for 14 days to receive
new evidence, and both the CDIU report and a Professional Statement of Need form (R.
1196–1200) were received. A fourth hearing was held on March 17, 2022. (*See* R. 13.)

Relevant to the issues presented for judicial review, at the November 2021 hearing
Dr. Carney considered whether Plaintiff's impairments met or equaled the "listings" for a
somatic symptom disorder, depressive disorder, or neurodevelopmental disorder.[3] (R. 69–
70.) The doctor testified that Plaintiff's case was "very problematic" in making that
determination because "he certainly claims he's got these ongoing pains but . . . they could
find no organic basis, no [etiology] for these pains and yet nonetheless he reports them and
certainly they think that they are disabling." (R. 70.) Dr. Carney further testified that no
physical findings supported Plaintiff's claim of inability to work. (R. 70.) Dr. Carney
pointed out that the neuropsychological examination results (that Plaintiff was in the less-
than-one-percentile group for every test) were either based on Plaintiff's subjective reports
or were not consistent with mild scores and normal mental status examinations documented
throughout his medical records. (R. 70–71.) In particular, no provider had found that
Plaintiff was slow, had borderline intellectual functioning, or had an intellectual disability.

---

[3] The "listings," also known as the Listing of Impairments, set the criteria the SSA uses in
determining whether a particular impairment "is severe enough to prevent an individual
from doing any gainful activity, regardless of his or her age, education, or work experience"
or, put simply, makes the claimant disabled. 20 C.F.R. §§ 404.1525(a), 404.1520(a)(4)(iii),
416.925(a), 416.920(a)(4)(iii); *see generally* 20 C.F.R. pt. 404, subpt. P, app. 1.

(R. 71.) Nor were the neuropsychological examination results consistent with Plaintiff's ability to work in the past, even though that work was unskilled. (R. 72–73.) If the scores were accurate, Dr. Carney testified, Plaintiff would be "nonfunctional basically." (R. 73.)

On March 31, 2022, the ALJ issued a written decision finding Plaintiff not disabled. (R. 12–36.) The ALJ followed the familiar five-step sequential analysis outlined in 20 C.F.R. §§ 404.1520 and 416.920. At each step, the ALJ considered whether Plaintiff was disabled based on the criteria of that step. If he was not, the ALJ proceeded to the next step. *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).

The ALJ first determined that Plaintiff had not engaged in substantial gainful activity since the alleged onset date. (R. 15.) At the second step of the sequential analysis, the ALJ found that Plaintiff had the following severe impairments: somatic symptom disorder, major depressive disorder, cannabis use disorder, and neurodevelopmental disorder. (R. 15.)

At step three, the ALJ concluded that Plaintiff's impairments did not meet or medically equal the severity of an impairment listed in 20 C.F.R. part 404, subpart P, appendix I. (R. 17.) The ALJ considered listings for neurocognitive disorders (Listing 12.02); depressive, bipolar, and related disorders (Listing 12.04); somatic symptom and related disorders (Listing 12.07); and trauma- and stressor-related disorders (Listing 12.15). (R. 17.) None of the listings were met or medically equaled because Plaintiff was only "moderately" limited in his abilities to understand, remember, or apply information;

to interact with others; to concentrate, persist, or maintain pace; and to adapt or manage himself.[4] (R. 17–19.)

Before proceeding to step four, the ALJ assessed Plaintiff's RFC, which is a measure of "the most [he] can still do despite [his] limitations." 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). The ALJ's RFC assessment included consideration of the medical opinion evidence. The ALJ found Dr. Carney's opinion persuasive, the opinions of the state agency psychological consultants partially persuasive, and the neuropsychological examination findings not persuasive. (R. 33–34.) Ultimately, the ALJ found that Plaintiff

> has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: The claimant is limited to simple routine repetitive tasks and may have occasional superficial contact with others where superficial is rated no lower than an 8 on the Selected Characteristics of Occupations' people rating.

(R. 21.) With this RFC, the ALJ concluded, Plaintiff could perform his past work as a housekeeper or packager. (R. 34.) Consequently, Plaintiff was not disabled. (R. 36.)

The Appeals Council denied Plaintiff's request for review of the ALJ's decision. (R. 1.) This made the ALJ's decision the final decision of the Commissioner for the purpose of judicial review.

---

[4] To meet or medically equal one of these listings under the criteria applied by the ALJ (the "paragraph B" criteria), Plaintiff's impairments must have caused one "extreme" limitation or two "marked" limitations. 20 C.F.R. pt. 404, subpt. P, app. 1.

## II.     Standard of Review

Judicial review of the Commissioner's denial of benefits is limited to determining whether substantial evidence in the record as a whole supports the decision, 42 U.S.C. § 405(g), or whether the ALJ committed an error of law, *Nash v. Commissioner, Social Security Administration*, 907 F.3d 1086, 1089 (8th Cir. 2018). "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." *Krogmeier v. Barnhart*, 294 F.3d 1019, 1022 (8th Cir. 2002) (citing *Prosch v. Apfel*, 201 F.3d 1010, 1012 (8th Cir. 2000)). The Court must examine "evidence that detracts from the Commissioner's decision as well as evidence that supports it." *Id.* (citing *Craig v. Apfel*, 212 F.3d 433, 436 (8th Cir. 2000)). The Court may not reverse the ALJ's decision simply because substantial evidence would support a different outcome or because the Court would have decided the case differently. *Id.* (citing *Woolf v. Shalala*, 3 F.3d 1210, 1213 (8th Cir. 1993)). In other words, if it is possible to reach two inconsistent positions from the evidence and one of those positions is that of the Commissioner, the Court must affirm the decision. *Robinson v. Sullivan*, 956 F.2d 836, 838 (8th Cir. 1992).

A claimant has the burden to prove disability. *See Roth v. Shalala*, 45 F.3d 279, 282 (8th Cir. 1995). To meet the definition of disability for DIB and SSI, the claimant must establish that he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). The disability, not just the

impairment, must have lasted or be expected to last for at least twelve months. *Titus v. Sullivan*, 4 F.3d 590, 594 (8th Cir. 1993).

## III.   Discussion

Plaintiff raises several points of error in support of his arguments that the ALJ erred in evaluating the severity of Plaintiff's mental health impairments and in assessing Plaintiff's RFC. The Court addresses each in turn below.

### A.   Substantial evidence supports the ALJ's finding that Plaintiff had relatively few symptom reports and unremarkable or normal mental status examination findings.

Plaintiff first takes issue with the ALJ's finding that Plaintiff had relatively few symptom reports and unremarkable or normal mental status findings. (Pl.'s Mem. at 3.) Plaintiff identifies several pages in the record that contain evidence contrary to the ALJ's finding. For example, Plaintiff cites to an exhibit documenting a PHQ-9 score of 20 and points out that such a score indicates "severe depression." (Pl.'s Mem. at 3 (citing R. 657).) Indeed, the ALJ acknowledged the PHQ-9 score of 20, but the ALJ also noted several other PHQ-9 scores in the range between 6 and 13, which indicated only mild to moderate depression. (R. 25, 29–30.) In determining that Plaintiff's PHQ-9 scores, on balance, indicated no more than mild depression, the ALJ referred to treatment notes that documented relatively normal or insignificant mental status examination findings and progress notes that reflected Plaintiff's belief that he could not work if he had any amount of pain. (R. 29–30.)

Other evidence, specifically mentioned by the ALJ in his written decision, also supports the ALJ's finding that Plaintiff had relatively few symptom reports and

unremarkable or inconsistent mental status examination findings. Significantly, Plaintiff's providers could not find a cause for his pain, nor did physical findings support an inability to work. (R. 22.) Plaintiff indicated more than once that he needed to be pain-free in order to work. (R. 24–25, 27.) Plaintiff attributed his mental impairments to pain, yet he described his pain as minimal: either less than one percent or a "1.5." (R. 25–26.) Mental status examinations findings were frequently normal, including intact memory, good memory recall, normal cognition, and good attention and concentration. (R. 24–27; *see, e.g.*, 658–59, 661, 664–65, 668–69, 673, 677, 681–82, 685–86, 691–92, 696, 809, 816, 844–45, 870, 937.) In identifying evidence to the contrary, Plaintiff essentially asks this Court to reweigh the evidence, which the Court may not do. *Naber v. Shalala*, 22 F.3d 186, 188 (8th Cir. 1994) ("We do not reweigh the evidence or review the factual record de novo.").

It is clear from the ALJ's decision that he was aware of the inconsistencies and conflicting statements in the record concerning Plaintiff's symptoms and mental state. It was the ALJ's duty to resolve those conflicts. *Richardson v. Perales*, 402 U.S. 389, 399 (1971). Substantial evidence supports the ALJ's finding that Plaintiff had relatively few symptom reports and unremarkable or inconsistent mental status examination findings.

### B.     The ALJ did not disregard evidence from Drs. Shaqra and Okubamichael.

Relatedly, Plaintiff contends that the ALJ disregarded certain evidence from Drs. Shaqra and Okubamichael. (Pl.'s Mem. at 4.) In particular, Plaintiff notes that Dr. Shaqra wrote that Plaintiff might need a functional capacity assessment and a neuropsychological

11

evaluation, and that Plaintiff had a flat affect and may not have understood Dr. Shaqra. The ALJ did not overlook this evidence. Rather, the ALJ specifically noted Dr. Shaqra's finding of a flat affect but also cited other findings of a full or normal affect. (R. 24–27.) The ALJ also considered Dr. Shaqra's comment that he was not sure how much of their conversation Plaintiff understood. (R. 26.) With respect to Dr. Shaqra's belief that Plaintiff might need a functional capacity assessment and a neuropsychological evaluation, the ALJ recessed Plaintiff's first hearing to obtain a neuropsychological report, and the state agency consultants conducted both physical and mental functional capacity assessments. (R. 122–27, 158–62.) Not only did the ALJ consider the evidence from Dr. Shaqra at issue, but Plaintiff has not explained how the evidence would have required the ALJ to reach a different result. *See Fentress v. Berryhill*, 854 F.3d 1016, 1021 (8th Cir. 2017).

Similarly, Plaintiff contends that the ALJ disregarded Dr. Okubamichael's findings that Plaintiff had chronic fatigue, loss of interest, and feelings of depression. (Pl.'s Mem. at 4.) To the contrary, the ALJ referred to this medical record in the written decision; noted Plaintiff's self-reports of back pain, fatigue, and loss of interest; and acknowledged a mental status examination finding of a slightly depressed mood. (R. 24 (citing R. 787–88).) As with Dr. Shaqra, Plaintiff has not explained how this evidence from Dr. Okubamichael would have required a different outcome.

### C. The ALJ did not err by relying on evidence from nonacceptable medical sources.

Plaintiff next faults the ALJ for relying on evidence from Elizabeth Perdue, a registered nurse, and Colette Neron Ellenbecker, a licensed social worker, without

acknowledging that these individuals were not "acceptable medical sources."[5] (Pl.'s Mem. at 5, 6.) Ms. Perdue periodically checked-in with Plaintiff concerning his care. (*E.g.*, R. 929.) In February 2022, Ms. Ellenbecker conducted an annual diagnostic assessment of Plaintiff's mental status and level of functioning to ascertain his need and eligibility for Adult Rehabilitative Mental Health Services ("ARMHS"). (R. 1162–70.) Plaintiff further contends the ALJ should not have relied on evidence from Rachel Geier, a licensed social worker, even though the ALJ acknowledged she was not an acceptable medical source. Ms. Geier consulted with Plaintiff for treatment of depression and stress. (*E.g.*, R. 713.)

The ALJ did not err by relying on evidence from Ms. Perdue, Ms. Ellenbecker, and Ms. Geier. Although only an acceptable medical source can provide objective medical evidence to establish a physical or mental impairment, *see* 20 C.F.R. § 404.1521, the ALJ may consider statements from other medical sources and from nonmedical sources in assessing a claimant's RFC, *see* 20 C.F.R. § 404.1545(a)(3), (e). The ALJ may also consider statements from "nonacceptable" medical sources and nonmedical sources in evaluating symptoms such as pain. 20 C.F.R. §§ 404.1529(a), 416.929(a).

Plaintiff also points out that the ALJ did not acknowledge notations from Ms. Perdue such as "confused," "loose association," and "unable to assess." (Pl.'s Mem. at 5.) Plaintiff has not shown, however, how this evidence would have required the ALJ to reach

---

[5] An "acceptable medical source" includes licensed physicians, licensed psychologists, licensed advanced practice registered nurses, and licensed physician assistants, among others. 20 C.F.R. §§ 404.1502(a), 416.902(a).

a different result. In addition, an ALJ need not discuss each notation in every treatment record.

**D.      The ALJ did not find that Plaintiff had no mental impairments.**

Plaintiff asks in his memorandum, perhaps rhetorically, "if he didn't have mental health issues, why wasn't he discharged?" (Pl.'s Mem. at 7.) The ALJ did not determine, however, that Plaintiff had no mental health issues or impairments. To the contrary, the ALJ determined that Plaintiff had a somatic symptom disorder, major depressive disorder, and neurodevelopmental disorder, and that these disorders were severe impairments. (R. 15.) The ALJ also found that, as a result of these impairments, Plaintiff should be limited to simple, routine, and repetitive tasks and to only occasional and superficial contact with others. (R. 21.) The ALJ did not suggest that Plaintiff had no mental impairments or should cease treatment.

**E.      The ALJ did not disregard evidence from Drs. Gamaliel Ferrer and Michael Balfanz.**

Plaintiff refers to treatment records from Drs. Gamaliel Ferrer and Michael Balfanz, who treated Plaintiff for physical conditions, that also mention Plaintiff's mental health and intellectual abilities. (Pl.'s Mem. at 7.) In February 2021, Dr. Ferrer completed a Minnesota Department of Human Services Professional Statement of Need form for Plaintiff to receive housing support and stabilization services. (R. 1112–13.) Dr. Ferrer checked the box "mental health" for the required "disabling condition" and the box indicating that the condition would last at least one year. The form explained that a disability determination or formal diagnostic assessment was not required, and Dr. Ferrer

provided no other information about the "disabling condition." In June 2019, Dr. Balfanz, a chiropractor, remarked that Plaintiff was "having a bit of difficulty communicating with me due to language as well as intellectual ability." (R. 702.)

Plaintiff has not explained how this evidence would have required the ALJ to reach a different result. The form completed by Dr. Ferrer is conclusory and lacks any supporting findings or details. Dr. Balfanz's remark appears to be an isolated one; lacks supporting findings or details; and is inconsistent with numerous other treatment records cited by the ALJ in the decision, documenting Plaintiff's ability to communicate effectively (R. 18, 24, 25, 27, 31, 34). In addition, an ALJ is not required to discuss each and every treatment note in the record, and these conclusory records are of tangential relevance to Plaintiff's mental impairments. Finally, to the extent these records could be considered substantial evidence, simply because they could support a different outcome does not mean the ALJ's decision is not supported by substantial evidence.

### F.   The ALJ properly considered the CDIU report.

Plaintiff asserts that the CDIU report did not really address his mental health impairments and thus the ALJ should not have considered it. (Pl.'s Mem. at 9.) The ALJ referred Plaintiff's case to the CDIU to resolve conflicting evidence in the record concerning Plaintiff's pain. The ALJ recounted several of the investigative findings including Plaintiff's ability to walk for extended periods of time, ability to spend time with others, and ability to function essentially independently at his residential boarding facility. (R. 30–31.) The CDIU report was directly relevant to whether Plaintiff could function better than he claimed. The report supports the ALJ's RFC findings that Plaintiff could

work at all exertional levels; with limitations to simple, routine, and repetitive tasks; and with occasional and superficial contacts with others. The CDIU report also supports the ALJ's determination that Plaintiff's statements about the intensity, persistence, and limiting effects of his symptoms—including pain—were not consistent with the medical and other evidence of record. And, finally, the CDIU report is inconsistent with the neuropsychological examination results, which, if believed, indicated that Plaintiff was basically nonfunctional.

Plaintiff also argues that the resident nurse had indicated on a Professional Statement of Need form in March 2020 that Plaintiff had a "mental illness" and would need assistance for a year or more, which is inconsistent with her comments to the investigator in March 2021 as reflected in the CDIU report. The Professional Statement of Need form is conclusory, however, and lacks any supporting findings or details. (R. 1110–11.) The nurse simply checked the box for "mental illness" and other boxes, without providing any explanation, documentation, or findings. Moreover, as with the form completed by Dr. Ferrer, Plaintiff has not explained how the March 2020 form would have required the ALJ to reach a different result. The form is inconsistent with other evidence of record, including the nurse's statements to the investigator, and it is the ALJ's duty to resolve inconsistencies in the record. *See Perales*, 402 U.S. at 399. Finally, to the extent the form could be considered substantial evidence, it does not overcome the substantial evidence that supports the ALJ's decision.

**G.      The ALJ properly resolved inconsistencies about Plaintiff's functioning.**

Plaintiff argues that the ALJ's finding about Plaintiff's ability to complete tasks is inconsistent with a Function Report that Plaintiff filled out. (Pl.'s Mem. at 9.) The ALJ found that Plaintiff "reported difficulty with concentration, but did not indicate any difficulty completing tasks." (R. 18–19.) Plaintiff concedes that he did not check the box on the Function Report that indicated problems completing tasks. (R. 569.) Plaintiff points out, however, that he answered "No" to the question, "Do you finish what you start?" (R. 569.)

It was the ALJ's duty to resolve inconsistencies in the evidence. *See Perales*, 402 U.S. at 399. To the extent Plaintiff's responses were inconsistent, the ALJ did not err by finding that Plaintiff did not have problems completing tasks. Substantial evidence supports this finding, not the least of which are Plaintiff's own responses on the Function Report. Other substantial evidence, cited by the ALJ in the written decision, includes Plaintiff's abilities to prepare simple meals, do his own laundry, and use public transportation; numerous mental status examination findings of no significant issues with concentration; and the opinions of state agency psychological consultants who found that Plaintiff could perform concrete, simple, short-cycle tasks. (R. 18–19, 32.) In addition, the ALJ found that Plaintiff's statements about the intensity, persistence, and limiting effects of his symptoms were not consistent with the objective medical evidence. (R. 22.) This would include Plaintiff's statement that he cannot finish what he starts. Finally, the ALJ did not conclude that Plaintiff had no limitation in his ability to complete tasks. Rather, the ALJ concluded that Plaintiff's ability to concentrate, persist, and maintain pace, which

17

would include his ability to complete tasks, was moderately limited. The ALJ therefore limited Plaintiff to simple, routine, repetitive tasks in the RFC assessment. The Court concludes that the ALJ did not err in resolving inconsistencies about Plaintiff's functioning.

###### H.    The ALJ did not fail in his duty to fully and fairly develop the record.

Plaintiff submits that the ALJ erred in his duty to fully and fairly develop the record. Specifically, Plaintiff contends that the ALJ should have ordered a post-hearing neuropsychological evaluation by a consultative examiner to address Dr. Carney's concern with the lack of physical findings to support Plaintiff's claims of pain and inability to work and to address the ALJ's skepticism about the accuracy of the neuropsychological evaluation findings. (Pl.'s Mem. at 10–11.)

The Court finds that the ALJ did not err. The ALJ's duty to fully and fairly develop the record is not limitless. "An ALJ is required to obtain additional medical evidence if the existing medical evidence is not a sufficient basis for a decision." *Naber v. Shalala*, 22 F.3d 186, 189 (8th Cir. 1994) (citation omitted). On the other side of the coin, "an ALJ is permitted to issue a decision without obtaining additional medical evidence so long as other evidence in the record provides a sufficient basis for the ALJ's decision." *Id.* (citation omitted).

Here, the existing medical record provided a sufficient basis for the ALJ's decision. Before the first hearing, the record already contained numerous treatment records and progress notes, medical source opinions, a function report from Plaintiff, and evidence from non-medical sources. The ALJ postponed three hearings to receive additional evidence. During those postponements, the ALJ allowed Plaintiff to submit a

neuropsychological report, arranged for testimony from a medical expert, and gave the medical expert time to review new evidence. After the fourth hearing, the ALJ held open the record and received the CDIU report and a Professional Statement of Need form.

With particular respect to Dr. Carney's concern with the lack of physical findings that would support Plaintiff's claims of pain and inability to work, the ALJ effectively resolved that concern by finding Plaintiff's statements about his pain and ability to work inconsistent with the objective medical evidence. The ALJ recounted evidence of normal or unremarkable physical and mental status examinations, Plaintiff's belief that he would need to be pain-free in order to work, Plaintiff's lack of follow-through with physical therapy, and the CDIU report that contained no observations of pain or other difficulties, among other evidence. (R. 24–31.) The ALJ explicitly found Plaintiff's "exam findings and providers' objective observations do not support the level of alleged limitations." (R. 22.) It is not likely that another neuropsychological evaluation would have provided the lacking physical findings.

The ALJ resolved his own skepticism about the accuracy of the neuropsychological evaluation by finding the report not persuasive. (R. 33.) The ALJ noted that the report was in direct contrast with normal mental status examinations, "all other treating providers' objective observations," Plaintiff's ability to work in the past, and the CDIU report. (R. 33–34.) If the findings in the neuropsychological evaluation were accepted, Plaintiff would be essentially non-functional, and that lack of functioning was starkly inconsistent with nearly all of the evidence of record.

In sum, the Court concludes the ALJ met his duty to fully and fairly develop the record.

**I.      The ALJ did not err by relying on Dr. Carney's testimony.**

Plaintiff argues that the ALJ should not have relied on Dr. Carney's testimony because Dr. Carney "waxed and waned" on Plaintiff's ability to maintain concentration, pace, and persistence. (Pl.'s Mem. at 12.) It is the ALJ's role to assess a claimant's RFC. *See* 20 C.F.R. §§ 404.1546, 416.946. Based on the ALJ's consideration of the evidence, he determined that Plaintiff had no more than moderate limitations in his ability to maintain concentration, pace, and persistence. The ALJ noted that Dr. Carney "deferred to opine as to limitations in concentrating, persisting, or maintaining pace," but the ALJ then supported the moderate limitation in this area with medical evidence from Plaintiff's providers and the opinions of the state agency psychological consultants.

Plaintiff also submits that Dr. Carney "struggled to understand the level of support" that he had at his residential boarding facility. (Pl.'s Mem. at 11.) The support Plaintiff *received*, however, is beside the point. The relevant inquiry is what activities Plaintiff *could* perform, and there is ample evidence that Plaintiff could care for himself, make simple meals, do his own laundry, shop for himself, walk for extended periods of time without visible pain or difficulty, socialize with others, use public transportation, and make his own medical appointments. The nurse at the facility said that Plaintiff required minimal care and was very independent.

Plaintiff next suggests that Dr. Carney should not have relied on the Function Report because the form was completed by an individual named Billy Anderson and there is no

proof that the answers came from Plaintiff. (Pl.'s Mem. at 11–12.) Plaintiff was not troubled by Billy Anderson's involvement, however, when he asked the Court to take into account the answer "No" to the question, "Do you finish what you start?" on the Function Report. Moreover, Plaintiff neglects to mention that Billy Anderson was his non-attorney representative at that time. (*See* R. 209.) The Court finds this argument unconvincing.

**J.      The ALJ properly considered the neuropsychological examination report.**

Plaintiff takes issue with the ALJ's failure to incorporate the results of the neuropsychological examination into the RFC and hypothetical question posed to the vocational expert. (Pl.'s Mem. at 15.) The Court has already touched on the ALJ's determination that the neuropsychological evaluation report was not persuasive, but expands that discussion here.

Title 20 C.F.R. §§ 404.1520c and 416.920c set forth the standards under which an ALJ considers medical opinion evidence. An ALJ considers how "persuasive" an opinion is according to five factors: supportability, consistency, relationship with the claimant, specialization, and any other relevant factors. 20 C.F.R. §§ 404.1520c(c)(1)–(5), 416.920c(c)(1)–(5). The "most important factors" are supportability and consistency. 20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2). The ALJ "may, but [is] not required to," explain how the remaining factors were considered. 20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2). The regulatory language pertaining to supportability provides that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical

finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." 20 C.F.R. §§ 404.1520c(c)(1), 416.920c(c)(1). In evaluating consistency, "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinions or prior administrative medical finding(s) will be." 20 C.F.R. §§ 404.1520c(c)(2), 416.920c(c)(2). In other words, supportability looks to how well the medical source justifies their own opinion, and consistency looks to how well the medical source's opinion fits with evidence from other sources.

The Court finds that the ALJ adequately considered the persuasiveness of the neuropsychological examination report and did not err in deeming it not persuasive. The ALJ exhaustively detailed how the findings in the report were inconsistent with evidence from other medical and nonmedical sources, including mental status examination findings, the CDIU report, treating providers' objective observations, frequently mild PHQ-9 scores, and Plaintiff's ability to work in the past. (R. 33–34.)

The ALJ also found the report was not supported by the examiner's own mental status examination findings, which noted that Plaintiff was dressed and groomed appropriately, walked with a normal and independent gait, had good eye contact, was cooperative, spoke normally, had no movement abnormalities, appeared to be in a good mood, had logical thought processes and content, displayed no loosening associations, showed no anxious disturbances, was alert and fully oriented, had developmentally appropriate attention and concentration, could describe recent events, showed an average fund of knowledge, used developmentally appropriate language, and had average insight

and judgment. (R. 33.) Nor was the report supported by evidence of an intervening head trauma or other significant event that would explain such a grave degree of cognitive decline. (R. 34.)

## IV.    Conclusion

The Commissioner's final decision is supported by substantial evidence in the record as a whole, and the ALJ committed no error of law. Accordingly, **IT IS HEREBY ORDERED THAT**:

1. Plaintiff's Motion for Summary Judgment (Dkt. No. 9) is **DENIED**.

2. The relief requested in Defendant's Brief (Dkt No. 17) is **GRANTED**, and the Commissioner's final decision is **AFFIRMED**.


**LET JUDGMENT BE ENTERED ACCORDINGLY**.


Date: June 17, 2024                    _s/ John F. Docherty_____
                                       JOHN F. DOCHERTY
                                       United States Magistrate Judge